UNITED STATES, Appellee,

v.

Catalino TORRES–MALDONADO and Marilyn Gotay–Colon, Defendants, Appellants,

UNITED STATES, Appellee,

v.

Hector SANTIAGO–ALICEA, Defendant, Appellant,

UNITED STATES, Appellee,

v.

Teddy Leon AYALA, Defendant, Appellant,

UNITED STATES, Appellee,

v.

Oscar Diaz CRUZ, Defendant, Appellant.

Nos. 92–1849 through 92–1852.

United States Court of Appeals, First Circuit.

Heard Sept. 8, 1993.

Decided Jan. 20, 1994.

Jose A. Fuentes Agostini with whom Dominguez & Totti, Hato Rey, PR, was on brief, for appellant Torres–Maldonada and Gotay–Colon.

Ramon Garcia Garcia, Santurce, PR, on brief, for appellant Santiago–Alicea.

Carlos R. Noriega, Hato Rey, PR, on brief, for appellant Ayala.

Harry R. Segarra, Santurce, PR, on brief, for appellant Diaz Cruz.

Kathleen A. Felton, Washington, DC, with whom Charles E. Fitzwilliam, U.S. Atty., Warren Vazquez, Asst. U.S. Atty., Hato Rey, PR, and Nina Goodman, Dept. of Justice, Washington, DC, were on brief, for appellee.

Before STAHL, Circuit Judge, COFFIN, Senior Circuit Judge, and DiCLERICO,* District Judge.

STAHL, Circuit Judge.

Defendants-appellants challenge various aspects of their drug and firearms convictions, arguing, *inter alia,* that insufficient evidence supports their convictions, and that their motions for severance and for suppression of evidence were improperly denied. We reverse the firearms convictions of two defendants and affirm all other convictions.

## I.

### FACTUAL BACKGROUND AND PRIOR PROCEEDINGS

For purposes of defendants' challenges to the sufficiency of the evidence, we begin by reciting the facts in the light most favorable to the government. *United States v. Mena–Robles,* 4 F.3d 1026, 1029 (1st Cir.1993).

Spanning a two-week period in late February and early March of 1991, a group of individuals, including defendants, occupied Rooms 310, 311 and 327 of the Carib Inn Hotel in Isla Verde, Puerto Rico. Two of the rooms were registered to false names.

Soon, the activities of the occupants of all three rooms attracted the attention of hotel employees. The hotel's chief of security observed "continual" visits to occupants of all three rooms made by young people who often drove luxury cars and stayed for periods of about ten minutes. In a hotel of 225 guest rooms, the group in the three rooms received 90% of all phone calls made to the hotel. Moreover, the group paid their hotel bills in cash, using bundles of small denominations wrapped in rubber bands. On a few occasions, the occupants paid for all three of the rooms together in amounts totaling approximately $300 to $400. In addition, a "floor supervisor" in charge of maid service on defendants' floor at the hotel saw the occupants of all three rooms passing frequently among the three rooms.

On March 6, 1991, the same floor supervisor observed two revolvers on top of a bureau in Room 327. She informed both the hotel's chief of security and local police, who, in turn, contacted agents of the United States Bureau of Alcohol, Tobacco and Firearms (ATF). Later that day, ATF agents and local police officers began surveillance at the Carib Inn Hotel.

At approximately 11:00 p.m. on March 6, 1991 the surveilling agents observed defendants Hector Santiago–Alicea (Santiago–Alicea), Teddy Leon Ayala (Leon), Oscar Diaz Cruz (Diaz) and Frankie Nieves–Burgos (Nieves–Burgos) [1] with an unidentified man in the hotel lobby. Santiago–Alicea was wearing a bulletproof jacket, and the agents noticed a bulge under the jacket which appeared to be a gun. The group proceeded from the lobby to the hotel parking lot where the unidentified individual, after opening the trunk of a car, opened a plastic bag inside the trunk and counted unidentified items inside the bag. He handed the bag to Santiago–Alicea, who then showed the contents to Leon, who gave a facial sign of approval and an affirmative nod of his head.

Later that evening, a second unidentified man arrived at the hotel, made a call on the hotel's "house phone," and was met shortly thereafter in the lobby by Nieves–Burgos and another defendant, Pedro Luis Ramirez–Rivera (Ramirez–Rivera).[2] After a brief conversation, Nieves–Burgos and Ramirez–Riv-

---

* Of the District of New Hampshire, sitting by designation.

1. Nieves–Burgos, convicted below, is not a party to this appeal.

2. Ramirez–Rivera, convicted below, is not a party to this appeal.

era went back upstairs. Shortly thereafter they reappeared with Santiago–Alicea, who then exchanged packages with the unidentified man.

On March 7, 1991, the following day, Santiago–Alicea was observed waiting in the hotel parking lot, looking in all directions. A car pulled up to him and, after a brief conversation, Santiago–Alicea handed a small paper bag to its driver, received money in exchange, counted the money, put it in his pocket and returned to the hotel.

On the basis of the foregoing events, ATF and local law enforcement officials obtained a search warrant for the three hotel rooms. On that same afternoon of March 7, 1991, they executed the warrant. Upon entering Room 311, they found defendant Catalino Torres–Maldonado (Torres–Maldonado) seated on the floor talking on the phone, and his wife, defendant Marilyn Gotay–Colon (Gotay–Colon), seated on the sofa. Nieves–Burgos and Ramirez–Rivera were stretched out on separate beds in the room, clad only in underpants. Santiago–Alicea was seated on the end of one of the beds.

Upon searching the room, the agents found that Gotay–Colon's purse contained cocaine in a plastic bag which was marked with a picture of a unicorn. Her purse also held approximately $400 in cash in a bundle secured by a rubber band. In a zippered, opaque tote bag on the sofa on which Gotay–Colon was seated, the agents found $2000 in cash in a bundle, again secured by a rubber band, and a loaded semiautomatic pistol.

On a night table in the room, the agents found a plastic bag containing cocaine, approximately $1500 in cash, brown paper bags, and a homemade pipe used for smoking drugs. In the room's closet was the bulletproof jacket seen on Santiago–Alicea the night before. Under the bed, the agents found empty plastic bags labeled with a picture of a unicorn, along with plastic straw-and-spoon type implements typical of the sort used to cut and package drugs for resale. The agents also found razor blades, ordinary playing cards, and a stapler, all of which can be used to package drugs. They also found beepers and cellular telephones. Finally, the agents discovered keys to a gray Buick, which would later be searched by the agents.

Rooms 310 and 327, though unoccupied at the time of the search, also contained drugs and drug-related items. Room 310 contained fifty-five packets of cocaine, again marked with a unicorn, which were found in a brown paper bag hidden in a roll-away bed or sofa-bed. There was also a small amount of narcotics in an ashtray and a pipe used for smoking drugs. The search of Room 327 turned up a pillowcase hidden above a "dropped ceiling" in the bathroom. It contained sixteen brown paper bags, each of which, in turn, held 100 small packets marked with the unicorn symbol and filled with cocaine. Under a sofa, the agents found a bullet that fit the semiautomatic pistol found in Room 311.

Later that day, Leon and Diaz, who had been present for one of the transactions the night before, but who had not been present during the search of Room 311, arrived at the hotel. Leon exclaimed, "Oh, my god, they busted my people." [3] The agents asked Leon and Diaz if they knew the occupants of Room 311. They replied in the affirmative. Leon was carrying over $6700 in cash and a key to Room 310. Diaz had over $1400 in cash and a hotel receipt for Room 327.

The agents subsequently searched two cars in the hotel parking lot. In the first car, a green Ford LTD, they found a loaded .357 six-shot revolver, along with a photograph of Nieves–Burgos and a parking receipt with Nieves–Burgos' fingerprint on it. The second car searched was the gray Buick, keys to which had been found in the search of Room 311. In the Buick, the agents found a loaded nine millimeter pistol, with additional ammunition and one "spent" or fired bullet cartridge. Though the Buick was not registered in Santiago–Alicea's name, the registration to the car was found in Santiago–Alicea's wallet.

---

**3.** The parties agree that the exclamation was in Spanish, not English. One report stated that the exclamation was more closely translated as "They busted *the* people." Nonetheless, the officer who allegedly heard the remark testified at trial that the exclamation was, "Oh, my god, they busted my people."

Defendants were tried together. Torres–Maldonado, Gotay–Colon, Santiago–Alicea, Leon, and Diaz were all convicted of conspiring to possess cocaine with intent to distribute, and of possession of cocaine with intent to distribute. *See* 21 U.S.C. §§ 841(a)(1), 846.[4] Gotay–Colon was also convicted of possession of cocaine based on the amount found in her purse. *See* 21 U.S.C. § 844(a).[5] In addition, Torres–Maldonado, Gotay–Colon and Santiago–Alicea were convicted of using a firearm during and in relation to a drug offense. *See* 18 U.S.C. § 924(c)(1).[6] Defendants raise various grounds for appeal. We address them in turn.

## II.

## DISCUSSION

### A. *Sufficiency of the Evidence*

#### 1. *Standard of Review*

█ In reviewing challenges to the sufficiency of the evidence, "[o]ur task is to review the record to determine whether the evidence and reasonable inferences therefrom, taken as a whole and in the light most favorable to the prosecution, would allow a rational jury to determine beyond a reasonable doubt that the defendants were guilty as charged." *Mena–Robles,* 4 F.3d at 1031. Moreover, "[w]e do not weigh witness credibility, but resolve all credibility issues in favor of the verdict. The evidence may be entirely circumstantial and need not exclude every reasonable hypothesis of innocence; that is, the factfinder may decide among reasonable interpretations of the evidence." *United States v. Cassiere,* 4 F.3d 1006, 1011

(1st Cir.1993) (quoting *United States v. Batista–Polanco,* 927 F.2d 14, 17 (1st Cir.1991)).

#### 2. *Conspiracy and Possession with Intent to Distribute*

█ Torres–Maldonado and Gotay–Colon claim that the evidence at trial showed no more than their "mere presence" at the hotel. We have recently stated that "the culpability of a defendant's presence hinges upon whether the circumstances fairly imply participatory involvement. In other words, a defendant's 'mere presence' argument will fail in situations where the 'mere' is lacking." *United States v. Echeverri,* 982 F.2d 675, 678 (1st Cir.1993). While the government's evidence against Torres–Maldonado and Gotay–Colon is less abundant than its evidence against several other defendants, it is nonetheless sufficient to support a finding of guilt beyond a reasonable doubt as to the conspiracy and possession counts.

Hotel personnel testified that both Torres–Maldonado and Gotay–Colon were associated with the group that occupied Rooms 310, 311 and 327. A front desk supervisor identified Torres–Maldonado as a member of the group who had been present when cash payments were made for the three rooms, and the floor supervisor mentioned above testified that she observed Gotay–Colon passing between the three rooms. She recalled a specific instance when Gotay–Colon went to Room 327 with Santiago–Alicea.

In addition, drugs and drug paraphernalia were lying in open view in Room 311 at the time of Torres–Maldonado's and Gotay–Colon's arrest. Torres–Maldonado was talking on the phone when the agents entered, allowing an inference that he and Gotay–Colon

---

**4.** Section 841(a)(1) states in relevant part that "it shall be unlawful for any person knowingly or intentionally ... to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."

Section 846 states, "Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

**5.** Section 844(a) states, in relevant part, "It shall be unlawful for any person knowingly or intentionally to possess a controlled substance...."

**6.** Section 924(c)(1) provides, in relevant part:

Whoever, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years....

were more than mere visitors. The cocaine found in Gotay–Colon's purse, which was packaged in a bag bearing the unicorn symbol, further supports that inference. Finally, the bundle of cash, secured characteristically with a rubber band, provides further evidence linking the couple to the group in the hotel and to drug-related activity. In sum, there is sufficient record evidence from which a reasonable jury could conclude beyond a reasonable doubt that Torres–Maldonado and Gotay–Colon were guilty of both conspiracy and possession with intent to distribute the drugs found at the hotel, and that, on the basis of the drugs found in her purse, Gotay–Colon was guilty of simple possession.

Even more compelling evidence, both direct and circumstantial, supports the conspiracy and possession convictions of the other defendants in this case. For example, a jury could reasonably infer that Leon, Diaz, and Santiago–Alicea were observed by ATF agents making the very drug transactions which serve as the basis for their conspiracy and possession convictions. Therefore, we conclude that sufficient evidence supports those convictions.

### 3. The Firearms Convictions

Santiago–Alicea, Torres–Maldonado and Gotay–Colon also challenge the sufficiency of the evidence supporting their convictions under 18 U.S.C. § 924(c)(1) for using a firearm during and in relation to a drug offense.

#### a. Santiago–Alicea

■ Santiago–Alicea was observed wearing a bullet-proof vest with a protruding bulge beneath it. So clad, he engaged in what appeared to be a drug deal in the parking lot of the Hotel Carib Inn. Using the same standard of review recited above, we conclude that a reasonable jury could have found beyond a reasonable doubt that the bulge was one of the guns found in the drug raid, and that Santiago–Alicea was "us-

7. Nor has the government argued, either below or on appeal, that *Pinkerton* liability should apply to hold Torres–Maldonado and Gotay–Colon liable for the use of firearms by their coconspirators.

ing" the gun, as that term is used in section 924(c)(1), during and in relation to a drug offense. Accordingly, we affirm his conviction.

#### b. Torres–Maldonado and Gotay–Colon

While there are several possible grounds upon which section 924(c)(1) liability may rest, the evidence against Torres–Maldonado and Gotay–Colon is insufficient to support a section 924(c)(1) conviction under any applicable theory.

##### (1) Pinkerton Liability

■ We begin by noting that, although members of a conspiracy may be held liable for substantive crimes committed by a coconspirator in furtherance of the conspiracy, *see, e.g., Pinkerton v. United States,* 328 U.S. 640, 646–47, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946); *United States v. Barker Steel Co.,* 985 F.2d 1123, 1128–29 (1st Cir.1993), the jury in this case was not so instructed.[7] On appeal, we will not infer either that the jury found guilt based on a theory upon which it was not instructed, or that the jury would have found guilt had it been given a *Pinkerton* instruction. *See United States v. Labat,* 905 F.2d 18, 23 (2d Cir.1990) (citing *Nye & Nissen v. United States,* 336 U.S. 613, 618, 69 S.Ct. 766, 769, 93 L.Ed. 919 (1949)); *United States v. Raffone,* 693 F.2d 1343, 1346 (11th Cir.1982) (similar), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2094, 77 L.Ed.2d 303 (1983). Accordingly, we decline to affirm defendants' firearms convictions on *Pinkerton* grounds.

##### (2) Actual or Constructive Possession

The government argues essentially that the physical proximity of Torres–Maldonado and Gotay–Colon to the gun found in the tote bag at the time of the arrest is sufficient to support an inference that they "used" or were prepared to use the gun in a drug transaction for section 924(c)(1) purposes.[8] We disagree.

8. The government does not argue, nor does the evidence support an inference, that Torres–Maldonado and Gotay–Colon's convictions under Section 924(c) could be supported by the gun

■ It is well established that a weapon need not be "brandished, displayed, or discharged" in order to sustain a conviction under section 924(c)(1). *See United States v. Castro–Lara,* 970 F.2d 976, 983 (1st Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2935, 124 L.Ed.2d 684 (1993); *United States v. Plummer,* 964 F.2d 1251, 1255 (1st Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 350, 121 L.Ed.2d 265 (1992). Nonetheless, "there must be some facilitative nexus between the weapon and the criminal activity." *Castro–Lara,* 970 F.2d at 983. Moreover, in order to establish that a defendant "used" a firearm for purposes of section 924(c)(1), "the government must prove that the defendant actually or constructively possessed it." *United States v. Harrison,* 931 F.2d 65, 71 (D.C.Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 408, 116 L.Ed.2d 356 (1991). *See also United States v. Long,* 905 F.2d 1572, 1576 & n. 6 (D.C.Cir.), *cert. denied,* 498 U.S. 948, 111 S.Ct. 365, 112 L.Ed.2d 328 (1990). In this case, we find neither actual nor constructive possession.

■ The government's evidence does not establish that either Torres–Maldonado or Gotay–Colon had any direct or actual possessory interest in the firearm in the bag. In fact, one government witness, who had been asked to identify particular government exhibits, was also asked to state which defendant appeared to own or control each exhibit. Upon identifying the bag which contained the gun at issue, the witness replied that it was linked to "[n]o defendant." No further evidence in the record tends to show that either Torres–Maldonado or Gotay–Colon ever exercised actual possession over the gun or the bag.

The evidence of constructive possession is equally scant. Constructive possession exists when a person "knowingly has the power and intention at a given time to exercise dominion and control over an object, either directly or through others." *United States v. Garcia,* 983 F.2d 1160, 1164 (1st Cir.1993) (citations and internal quotations omitted). Unlike the evidence against the other defendants who are party to this appeal, the evidence against Torres–Maldonado and Gotay–Colon failed to

found during the searches of the two cars in this

establish any connection between these two defendants, on one hand, and those drug distribution transactions which appeared to involve guns, on the other.

When viewed in the light most favorable to the government, the evidence shows that only one group of the defendants, which did not include either Torres–Maldonado or Gotay–Colon, was involved in armed drug deals in and around the hotel. Additional evidence linking Torres–Maldonado and Gotay–Colon to the group *generally* falls far short of establishing that either defendant knew of or participated in the armed drug deals. *Cf. United States v. Matthews,* 942 F.2d 779, 783–84 (10th Cir.1991) (affirming drug conspiracy and possession convictions and reversing conviction under section 924(c)(1) where the sole explanation for the presence of the weapons was to provide conspirators with protection on drug-selling "excursions," and where evidence showed that defendant had not participated in any such excursions); *United States v. Bruce,* 939 F.2d 1053, 1055–56 (D.C.Cir.1991) (reversing conviction under section 924(c)(1) despite gun's presence in an apartment containing drugs, on grounds that gun's intended use was "for defendant's protection at the time and place of *subsequent* distribution") (emphasis added).

Finally, there was no additional evidence tending to show that either Torres–Maldonado or Gotay–Colon exercised any "dominion and control" over any firearms, *see, e.g., Garcia,* 983 F.2d at 1164, that they had any "appreciable ability to guide the destiny" of firearms, *see, e.g., United States v. Staten,* 581 F.2d 878, 883 (D.C.Cir.1978), or that these defendants ever had "some stake in, some power over" the firearms found, *see, e.g., United States v. Pardo,* 636 F.2d 535, 549 (D.C.Cir.1980). *Cf. Matthews,* 942 F.2d at 783–84 (reversing section 924(c)(1) conviction where there was no evidence "that [defendant] intended to avail himself of the firearms in question"); *United States v. Feliz–Cordero,* 859 F.2d 250, 254 (2d Cir.1988) (holding that a loaded gun "found in the same room as drug paraphernalia during the course of a search pursuant to a warrant"

case.

was, standing alone, insufficient to support a conviction under section 924(c)(1)). We conclude that there was insufficient evidence to allow a jury to conclude beyond a reasonable doubt that Torres–Maldonado or Gotay–Colon actually or constructively possessed a firearm for purposes of section 924(c)(1).

### (3) Aiding and Abetting

Given such a lack of evidence of actual or constructive possession, the firearms convictions of Torres–Maldonado and Gotay–Colon may stand, if at all, only upon a theory that they aided and abetted in the use of the gun.[9] The government's evidence, however, is insufficient to uphold a conviction on an aiding and abetting theory.

 It is well settled in the case law interpreting section 924(c)(1) that an accomplice "must have known to a practical certainty that the principal would be [using] a gun." *United States v. Powell,* 929 F.2d 724, 728 (D.C.Cir.1991). *See also United States v. Williams,* 985 F.2d 749, 756 (5th Cir.) ("Because the evidence does not support an inference that [nonpossessing defendants] knew the gun was available to [possessing codefendant], the evidence is insufficient to support [nonpossessing defendants'] convictions on [a section 924(c)(1)] count."), *cert. denied,* —— U.S. ——, 114 S.Ct. 148, 126 L.Ed.2d 110 (1993); *United States v. Nelson,* 733 F.2d 364, 371 (5th Cir.) ("[W]e believe that in order to convict [defendant] on the theory that [coconspirator] aided and abetted [defendant], the government had to prove that [defendant] knew that [coconspirator] was carrying a firearm while the latter was carrying out the directions of the former."), *cert. denied,* 469 U.S. 937, 105 S.Ct. 341, 83 L.Ed.2d 276 (1984).

 In this case, there is insufficient evidence from which a jury could conclude beyond a reasonable doubt that Torres–Maldonado or Gotay–Colon knew of the use of the gun at any time. As noted above, while it *is* clear that Torres–Maldonado and Gotay–Colon had some ties to the group at the hotel,

there is no evidence that they were involved in, or knew of, that part of the group's activities which involved guns. In addition, given that the gun was concealed in a tote bag when the officers entered the room, there is no evidence that either Torres–Maldonado or Gotay–Colon knew of the gun's presence at the time of the arrest. Thus, we conclude that there was insufficient evidence to support the section 924(c)(1) convictions of either Torres–Maldonado or Gotay–Colon on a theory of aiding and abetting. *Cf. United States v. Thomas,* 987 F.2d 697, 701–02 (11th Cir. 1993) (reversing section 924(c)(1) conviction where nothing in the government's case linked defendant to gun possessed by a codefendant).

In sum, no evidence links either Torres–Maldonado or Gotay–Colon to the gun in the zippered bag, to the armed drug transactions or even to the bullet-proof vest found in the closet of Room 311. Given this dearth of evidence connecting either of these defendants to any firearm in this case, we reverse their convictions under section 924(c)(1).

### B. Severance

#### 1. Torres–Maldonado and Gotay–Colon

Prior to trial, Torres–Maldonado and Gotay–Colon filed a joint motion for severance. Attached to the motion was an affidavit from codefendant Santiago–Alicea, who stated that he was willing to testify at a separate trial that Torres–Maldonado and Gotay–Colon were "unaware" of any activities related to drugs or firearms, and that the couple had merely come to the Carib Inn Hotel in order to pick up money that Santiago–Alicea owed on a car that he had purchased from Gotay–Colon's brother.

Initially, a magistrate judge recommended that severance be granted. Santiago–Alicea, however, after conferring additionally with counsel, subsequently withdrew his offer to testify at a separate trial, whereupon the district court denied the motion for severance. Torres–Maldonado and Gotay–Colon

---

9. The indictment in this case included one count which charged all defendants with using, and with aiding and abetting in the use of, a firearm.

appeal the order denying their severance motion.

We begin by noting that "a trial judge has 'considerable latitude' in deciding severance questions and that the judge's resolution of them 'will be overturned only if that wide discretion is plainly abused.'" *United States v. O'Bryant,* 998 F.2d 21, 25 (1st Cir.1993) (quoting *United States v. Natanel,* 938 F.2d 302, 308 (1st Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 986, 117 L.Ed.2d 148 (1992)). Moreover, the Supreme Court has recently stated that "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States,* —— U.S. ——, ——, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993). Finally, we have recently reiterated that where, as here, a defendant seeks severance in order to secure the testimony of a codefendant, s/he must demonstrate, *inter alia,* that the codefendant "'will in fact testify if the cases are severed.'" *See United States v. Nason,* 9 F.3d 155, 158 (1st Cir.1993) (quoting *United States v. Drougas,* 748 F.2d 8, 19 (1st Cir.1984)).

Torres–Maldonado and Gotay–Colon sought severance in order to secure Santiago–Alicea's testimony. Aside from an unsubstantiated blanket claim of prejudice, Santiago–Alicea's initial offer to provide exculpatory testimony formed the *sole* basis for Torres–Maldonado and Gotay–Colon's motion for severance. Thus, even by the reasoning set out in Torres–Maldonado and Gotay–Colon's own motion for severance, once Santiago–Alicea withdrew his offer to testify at a separate trial, he also withdrew the entire basis of his codefendants' severance motion. Because the district court was given no additional justification for ordering a separate trial, we find no abuse in its denial of Torres–Maldonado and Gotay–Colon's severance motion.

Moreover, *nothing* at the joint trial prevented Torres–Maldonado and Gotay–Colon from putting on evidence from sources *other*

than Santiago–Alicea in order to corroborate their contention that they were merely visiting the hotel with regard to car payments. In fact, one witness so testified. In sum, Torres–Maldonado and Gotay–Colon failed to establish that a joint trial would compromise any "specific trial right," *see Zafiro,* —— U.S. at ——, 113 S.Ct. at 938, nor did they make the "strong showing of evident prejudice," *O'Bryant,* 998 F.2d at 25, which is required to obtain severance. Accordingly, the district court did not abuse its discretion in denying their motion.

### 2. *Leon*

Leon sought severance based upon the opening remarks of counsel for one of his codefendants, Pedro Panzardi Fuentes (Panzardi), who was acquitted below. During his opening, Panzardi's counsel stated, *inter alia,* "It is not my job to be a prosecutor in this case. So I don't have to prove who did it. It is the government's duty to prove our client guilty beyond a reasonable doubt. But we will prove to you, from the same evidence the government collected, that during a period of time, starting at the beginning of the year, the group which was trafficking in drugs was ... using the name Panzardi from those days."

Leon understood these remarks and others in Panzardi's opening statement to mean that Panzardi planned to bring evidence which would at once aid the government in proving its case against all of the other defendants and exonerate Panzardi. Leon unsuccessfully sought severance based upon potential prejudice from Panzardi's trial tactics. Upon careful review, we find no error in the district court's denial of this motion.

The sole basis for Leon's severance motion, both below and on appeal, has been the opening statement of Panzardi's counsel. A close reading of that opening statement shows that it was carefully, indeed artfully, worded by Panzardi's counsel to emphasize that Panzardi's innocence would be proven *irrespective* of the guilt of any of his codefendants.[10] Moreover, Leon points to no evi-

---

10. For example, Panzardi's counsel referred to a

"group which was trafficking drugs" without as-

dence at trial which was introduced or referred to by Panzardi that inculpated Leon or any of the other defendants.

The strongest possible basis for Leon's motion to sever is his view that Panzardi's defense would be antagonistic to his own. As we have recently stated, however, "[t]he fact that two defendants assert antagonistic defenses does not, *per se,* require severance, even if defendants are hostile or attempt to cast blame on each other." *United States v. McLaughlin,* 957 F.2d 12, 18 (1st Cir.1992). Rather, "the antagonism in defenses must be such that if the jury believes one defense, it is compelled to convict the other defendant." *United States v. Angiulo,* 897 F.2d 1169, 1195 (1st Cir.), *cert. denied,* 498 U.S. 845, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990). Leon has made no such showing in this case. The jury could have readily believed Panzardi's argument that his name was used by a group of people at the hotel, and nonetheless have acquitted Leon.[11] In sum, Panzardi's opening remarks did not amount to a strong showing of prejudice to Leon, nor were they subsequently accompanied by prejudicial tactics at trial. Accordingly, the district court did not err in denying Leon's motion for severance.

## C. Evidence Acquired Incident to the Warrantless Arrest

Both Leon and Diaz argue that they were arrested without probable cause, and that therefore the items seized from their persons during their arrest should have been suppressed. Again, we disagree.

In the context of warrantless arrests, as elsewhere, "[p]robable cause must be evaluated in light of the totality of circumstances." *United States v. Uricoechea–Casallas,* 946 F.2d 162, 165 (1st Cir.1991). Moreover, in order to establish that probable cause existed for such an arrest, the government "need not present the quantum of proof necessary to convict." *Id. See also United States v. Morris,* 977 F.2d 677, 684 (1st Cir. 1992) (same), *cert. denied,* —— U.S. ——, 113 S.Ct. 1588, 123 L.Ed.2d 155 (1993); *United States v. Figueroa,* 818 F.2d 1020, 1023 (1st Cir.1987) (same). Rather, it need only show that, at the time of the arrest, the facts and circumstances known to the arresting officers were sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense. *Id.; see also Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). The arrests of Leon and Diaz clearly met these standards.

Both Leon and Diaz had been observed on the evening prior to their arrest engaging in what appeared to be a drug deal. They were apprehended the following day returning to an area of the hotel which had recently been searched and which yielded large quantities of drugs, drug paraphernalia, and firearms. Finally, they admitted knowing members of the group who had been arrested earlier in the day. In total, the circumstances of this case indicate that the arresting officers had probable cause to believe that both Leon and Diaz had committed or were committing an offense. Therefore, their arrest was lawful. Moreover, it is well established that "[i]f an arrest is lawful, the arresting officers are entitled to search the individual apprehended pursuant to that arrest." *Uricoechea–Casallas,* 946 F.2d at 165. Accordingly, the district court did not err in admitting the evidence recovered in that search.

We have carefully considered all defendants' other claims and find them to be without merit.

## III.

## CONCLUSION

For the foregoing reasons, the convictions of Torres–Maldonado and Gotay–Colon under 18 U.S.C. § 924(c)(1) are *vacated.*

serting that Panzardi's codefendants actually comprised that group. In fact, counsel concluded his opening statement by arguing that the government's poor investigation had led "to a very bad investigation and possibly to the acquittal of *more than one person in this case.* Hopefully, my client *and whoever else is innocent.*" (emphasis supplied).

**11.** For instance, the jury was free to reason that Leon was never sufficiently identified as a member of the group at the hotel, or that, while he was a member of the group, the government's evidence did not sufficiently link him to the drug transactions at issue.

All other convictions and sentences are *affirmed.*